❒ Original          ❒ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) Case No.   22-853M(NJ) |
| Location History data for omathews716@gmail.com | ) |
| and moorekeshawn052@gmail.com, as further | ) |
| described in Attachment A. | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Eastern _____ District of _____ Wisconsin _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____ 3/9/22 _____ *(not to exceed 14 days)*
❒ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Hon. Nancy Joseph _____ .
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for _____ days *(not to exceed 30)*   ❒ until, the facts justifying, the later specific date of _____ .

Date and time issued:   2/23/22 10:11 am          *Judge's signature*

City and state:   Milwaukee, Wisconsin          Hon. Nancy Joseph, U.S. Magistrate Judge
                                                  *Printed name and title*

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**
**Property To Be Searched**
**Matter No. 2021R00412**

This warrant is directed to Google LLC and applies to:

(1) Location History data for <u>omathews716@gmail.com</u> and <u>moorekeshawn052@gmail.com</u>. The location data should be sourced from information including GPS data, cellular data, web App Activity, "My Activity", user photos, and information about visible wi-fi points and Bluetooth beacons transmitted from devices associated with <u>omathews716@gmail.com</u> and <u>moorekeshawn052@gmail.com</u> during April 29, 2020 12:00 am (CST) – November 17, 2021 8:00am (CST)

**ATTACHMENT B**
**Property to be Seized**
**Matter No. 2021R00412**

I.      Information to be disclosed by Google

The information described in Attachment A, via the following process:

1.  Google shall query Location History data for omathews716@gmail.com and moorekeshawn052@gmail.com as described in attachment A. The location data should be sourced from information including GPS data, cellular data, web App Activity, "My Activity", user photos, and information about visible wi-fi points and Bluetooth beacons transmitted from devices associated with omathews716@gmail.com and moorekeshawn052@gmail.com during April 29, 2020 12:00 am (CST) – November 17, 2021 8:00am (CST)

2.  The location data should include latitudinal and longitudinal coordinates, dates, and times for omathews716@gmail.com and moorekeshawn052@gmail.com for the abovementioned timeframe.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>Location History data for omathews716@gmail.com<br>and moorekeshawn052@gmail.com, as further<br>described in Attachment A. | )<br>)<br>)<br>)<br>)<br>)<br>)     Case No.    22-853M(NJ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) and 841(b)(1)(C) | Possession and distribution of a controlled substance. |

The application is based on these facts:

See Attached Affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

NICK STACHULA (Affiliate)   Digitally signed by NICK STACHULA (Affiliate)<br>Date: 2022.02.23 09:46:17 -06'00'

*Applicant's signature*

DEA TFO Nick Stachula

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means).*

Date: _____ 2/23/22 _____

*Judge's signature*

City and state: _____ Milwaukee, Wisconsin _____     Hon. Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

# AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A SEARCH WARRANT
## MATTER NO. 2021R00412

I, Nick Stachula, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.  I am employed as a Detective with the West Allis Police Department (WAPD) and have been a law enforcement officer for over 21 years. I have been a Detective for over 11 years and have been assigned to conduct narcotics investigations for over 10 years. I have been assigned to the North Central High Intensity Drug Trafficking Area (HIDTA) for over 4 years. I am also a Task Force Officer with the United States Department of Justice's Drug Enforcement Administration (DEA) and have been since January 2017. As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

2.  I have participated in numerous complex narcotics investigations which involved violations of state and federal controlled substances laws and money laundering laws, including Title 21, United States Code, Sections 841(a)(1), 843(b), and 846, Title 18, United States Code, Sections 1956 and 1957, and other related offenses. During my tenure as a law enforcement officer, I have been involved in the investigation of drug traffickers in Milwaukee County, in the State of Wisconsin, across the United States, and internationally.

3.  I have had both formal training and have participated in numerous complex drug trafficking investigations, including ones using wiretaps. I have received training in the investigation of drug trafficking, money laundering, financial investigations, and computer crimes. My training and experience include the following:

a. Through informant interviews and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations finance, source, purchase, transport, and distribute controlled substances in Wisconsin, throughout the United States, and internationally.

b. I have used my training and experience to locate, identify, and seize multiple types of narcotics, drugs, drug proceeds, and drug contraband.

c. I have also relied upon informants to obtain controlled substances from drug traffickers and have made undercover purchases of controlled substances.

d. I have extensive experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of numerous search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized.

e. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base (unless otherwise noted, all references to crack cocaine in this affidavit is cocaine base in the form of crack cocaine), ecstasy, and methamphetamine. I am familiar with the methods used by drug traffickers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances.

f. I am familiar with the language used over the telephone and other electronic communications to discuss drug trafficking and know that the language is often limited, guarded, and coded. I know the various code names used to describe controlled substances. I also know that drug traffickers often use electronic devices (such as computers and cellular phones), electronic communication services (such as e-mail and messaging services), and social media to facilitate these crimes.

g. I know drug traffickers often register phones, mailboxes, bank accounts, electronic communication services, and other instrumentalities of drug trafficking in the names of others, also known as nominees, to distance themselves from instrumentalities used to facilitate drug trafficking.

h. I know that drug traffickers often use electronic equipment and wireless and landline telephones to conduct drug trafficking operations.

i. I know that drug traffickers often keep documents and records about the transportation, sourcing, ordering, sale, and distribution of controlled substances, and drug traffickers will keep these documents and records on electronic devices, including cellular devices.

2

j.     I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase or title these assets in order to avoid scrutiny from law enforcement officials. I know that drug traffickers often secure drug proceeds at locations within their dominion and control, such as their residences, businesses, and storage facilities, and in safes or other secure containers.

k.     I know that drug traffickers often attempt to protect and conceal drug proceeds through money laundering, including but not limited to domestic and international banks, securities brokers, service professionals such as attorneys and accountants, casinos, real estate, shell corporations, business fronts, and otherwise legitimate businesses which generate large quantities of currency. I know it is common for drug traffickers to obtain, secrete, transfer, conceal, or spend drug proceeds, such as currency, financial instruments, precious metals, gemstones, jewelry, books, real estate, and vehicles. I know it is common for drug traffickers to maintain documents and records of these drug proceeds, such as bank records, passbooks, money drafts, transaction records, letters of credit, money orders, bank drafts, titles, ownership documents, cashier's checks, bank checks, safe deposit box keys, money wrappers, and other documents relating to the purchase of financial instruments or the transfer of funds. I know drug traffickers often purchase or title assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are titled or purchases by nominees, the drug traffickers actually own, use, and exercise dominion and control over these assets. The aforementioned books, records, receipts, notes, ledgers, and other documents are often maintained where the traffickers have ready access. These may be stored in hard copy or soft copy on paper, computers, cellular devices, and other electronic media or electronic storage devices.

l.     I know drug traffickers maintain large amounts of currency, including in readily accessible financial accounts, to finance their ongoing drug business. I know that those involved in drug trafficking or money laundering keep records of their transactions. Because drug trafficking generates large sums of cash, drug traffickers often keep detailed records about the distribution of narcotics and the laundering of proceeds. I also know that drug trafficking and money laundering activities require the cooperation, association, and communication between and among a number of people. As a result, people who traffic in narcotics or launder money for such organizations possess documents that identify other members of their organization, such as telephone books, address books, handwritten notations, telephone bills, and documents containing lists of names and addresses of criminal associates. Such records also provide information about the identities of coconspirators who launder money and

3

traffic drugs. I also know that drug traffickers commonly maintain addresses or telephone numbers which reflect names, addresses, or telephone numbers of their drug trafficking and money laundering associates in hard copy and soft copy on papers, books, computers, cellular devices, and other electronic media or electronic storage devices.

m.     I know drug traffickers often use electronic devices, such as telephones, cellular devices, computers, and currency counting machines to generate, transfer, count, record, or store the information described above and conduct drug trafficking and money laundering. I am familiar with computers, cellular devices, pagers, and other electronic media or electronic storage devices and their uses by drug traffickers to communicate with suppliers, customers, co-conspirators, and fellow traffickers. These devices often contain evidence of illegal activities in the form of communication records, voicemail, email, text messages, video and audio clips, location information, business records, and transaction records. I know drug traffickers take, store, preserve, or maintain photographs or videos of themselves, their associates, their property, their drugs, and their drug proceeds. These traffickers usually maintain these photographs or videos on computers, cellular devices, and other electronic media or electronic storage devices. Based upon my training and experience, I know that computer hardware and software may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime; and (2) the objects may have been used to collect and store information about crimes. I know the following information can be retrieved to show evidence of use of a computer or smartphone to further the drug trade: system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; computer media and any data contained within such media; operating system software, application or access program disks, manuals, books, brochures, or notes, computer access codes, user names, log files, configuration files, passwords, screen names, email addresses, IP addresses, and SIM cards.

n.     I have participated in numerous drug trafficking investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. This has led to evidence of the crimes under investigation and corroborated information already known or suspected by law enforcement. I have regularly used electronic evidence to find proof relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of suspects and conspirators.

o.     I have also participated in the execution of numerous premises search warrants and arrests, where controlled substances, firearms, drug

4

paraphernalia, drug proceeds, electronic devices, and records relating drug trafficking and drug proceeds were seized. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such.

p.    I have been assigned to court-authorized wiretaps and have been trained to operate the equipment used to conduct such operations.

4.    The information set forth in this affidavit comes from my personal involvement in this investigation, along with information provided to me by other law enforcement officers. Throughout this affidavit, I refer to case agents.  Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom I have had regular contact regarding this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.    Based on the facts as set forth in this affidavit, there is probable cause to believe that the information described in Attachment A contains evidence that Keandra K. MOORE (MOORE) and Oliver D. MATHEWS (MATHEWS) have committed violations of 21 U.S.C § 841(a)(1), 841(b)(1)(C) (distribution of a controlled substance).

## BACKGROUND RELATING TO GOOGLE AND RELEVANT TECHNOLOGY

6.    Based on my training and experience, I know that cellular devices, such as mobile telephone(s), are wireless devices that enable their users to send or receive wire and/or electronic communications using the networks provided by cellular service providers.  Using cellular networks, users of many cellular devices can send and receive communications over the Internet.

7.    I also know that many devices, including but not limited to cellular devices, have the ability to connect to wireless Internet ("wi-fi") access points if the user enables wi-fi connectivity.  These devices can, in such cases, enable their users to send or receive wire and/or

5

electronic communications via the wi-fi network. A tablet such as an iPad is an example of a device that may not have cellular service but that could connect to the Internet via wi-fi. Wi-fi access points, such as those created through the use of a router and offered in places like homes, hotels, airports, and coffee shops, are identified by a service set identifier ("SSID") that functions as the name of the wi-fi network. In general, devices with wi-fi capability routinely scan their environment to determine what wi-fi access points are within range and will display the names of networks within range under the device's wi-fi settings.

8. Based on my training and experience, I also know that many devices, including many cellular and mobile devices, feature Bluetooth functionality. Bluetooth allows for short-range wireless connections between devices, such as between a device such as a cellular phone or tablet and Bluetooth-enabled headphones. Bluetooth uses radio waves to allow the devices to exchange information. When Bluetooth is enabled, a device routinely scans its environment to identify Bluetooth devices, which emit beacons that can be detected by devices within the Bluetooth device's transmission range, to which it might connect.

9. Based on my training and experience, I also know that many cellular devices, such as mobile telephones, include global positioning system ("GPS") technology. Using this technology, the device can determine its precise geographical coordinates. If permitted by the user, this information is often used by apps installed on a device as part of the apps' operation.

10. Based on my training and experience, I know Google is a company that, among other things, offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Nearly every device using the Android operating system has an associated Google account, and users are prompted to add a Google account when they first turn on a new Android device.

6

11. In addition, based on my training and experience, I know that Google offers numerous apps and online-based services, including messaging and calling (e.g., Gmail, Hangouts, Duo, Voice), navigation (Maps), search engine (Google Search), and file creation, storage, and sharing (e.g., Drive, Keep, Photos, and YouTube). Many of these services are accessible only to users who have signed into their Google accounts. An individual can obtain a Google account by registering with Google, and the account identifier typically is in the form of a Gmail address (e.g., example@gmail.com). Other services, such as Maps and YouTube, can be used with limited functionality without the user being signed into a Google account.

12. Based on my training and experience, I also know Google offers an Internet browser known as Chrome that can be used on both computers and mobile devices. A user has the ability to sign-in to a Google account while using Chrome, which allows the user's bookmarks, browsing history, and other settings to be uploaded to Google and then synced across the various devices on which the subscriber may use the Chrome browsing software, although Chrome can also be used without signing into a Google account. Chrome is not limited to mobile devices running the Android operating system and can also be installed and used on Apple devices and Windows computers, among others.

13. Based on my training and experience, I know that, in the context of mobile devices, Google's cloud-based services can be accessed either via the device's Internet browser or via apps offered by Google that have been downloaded onto the device. Google apps exist for, and can be downloaded to, devices that do not run the Android operating system, such as Apple devices.

14. According to my training and experience, as well as open-source materials published by Google, I know that Google offers accountholders a service called "Location

7

History," which authorizes Google, when certain prerequisites are satisfied, to collect and retain a record of the locations where Google calculated a device to be based on information transmitted to Google by the device. That Location History is stored on Google servers, and it is associated with the Google account that is associated with the device. Each accountholder may view their Location History and may delete all or part of it at any time.

15. Based on my training and experience, I know that the location information collected by Google and stored within an account's Location History is derived from sources including GPS data and information about the wi-fi access points and Bluetooth beacons within range of the device. Google uses this information to calculate the device's estimated latitude and longitude, which varies in its accuracy depending on the source of the data. Google records the margin of error for its calculation as to the location of a device as a meter radius, referred to by Google as a "maps display radius," for each latitude and longitude point.

16. Based on open-source materials published by Google and my training and experience, I know that Location History is not turned on by default. A Google accountholder must opt-in to Location History and must enable location reporting with respect to each specific device and application on which they use their Google account in order for that usage to be recorded in Location History. A Google accountholder can also prevent additional Location History records from being created at any time by turning off the Location History setting for their Google account or by disabling location reporting for a particular device or Google application. When Location History is enabled, however, Google collects and retains location data for each device with Location Services enabled, associates it with the relevant Google account, and then uses this information for various purposes, including to tailor search results based on the user's location, to determine the user's location when Google Maps is used, and to

8

provide location-based advertising. As noted above, the Google accountholder also has the ability to view and, if desired, delete some or all Location History entries at any time by logging into their Google account or by enabling auto-deletion of their Location History records older than a set number of months.

17.     Location data, such as the location data in the possession of Google in the form of its users' Location Histories, can assist in a criminal investigation in various ways. As relevant here, I know based on my training and experience that Google has the ability to determine, based on location data collected and retained via the use of Google products as described above, devices that were likely in a particular geographic area during a particular time frame and to determine which Google account(s) those devices are associated with. Among other things, this information can indicate that a Google accountholder was near a given location at a time relevant to the criminal investigation by showing that his/her device reported being there.

18.     Based on my training and experience, I know that when individuals register with Google for an account, Google asks subscribers to provide certain personal identifying information. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, this information often provide clues to their identity, location, or illicit activities.

19.     Based on my training and experience, I also know that Google typically retains and can provide certain transactional information about the creation and use of each account on

9

its system. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, Google often has records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.

## PROBABLE CAUSE

20.     On November 8, 2021, at approximately 3:10 p.m. the WAPD responded to the address of XX32 South 89th Street, Upper, in the City of West Allis, County of Milwaukee, State of Wisconsin for a report of a check on the welfare of David B. Allen (DOB XX/XX/1993) (Allen). Allen was found deceased and there were signs of drug use present in the residence, including a rolled up one dollar bill near 0.47 grams of orange / brown chunky substance and corner torn clear plastic baggie on the coffee table. Case agents tested the 0.47 grams of brown / orange chunky substance using Nark II 20033 Fentanyl Reagent field test and it returned a positive result for fentanyl.

21.     Case agents also located a Samsung Galaxy S9 cellular telephone that was identified as Allen's cellular telephone. Case agents determined the last outgoing calls placed on Allen's cellular telephone were placed on November 4, 2021, and the last number contacted was identified as 414-388-1619. Based on my training and experience in investigating drugs trafficking offense, the text communications between Allen and the number of 414-388-1619

10

were consistent with arranging the purchase of drugs, including discussion of drugs and then meet locations. For example, Allen and the number of 414-388-1619 discussed qualities of substance such as "fire" "boy" and "girl." Based on my training and experience these are known slang terms used by drug users and drugs traffickers for different controlled substances. I know "boy" or "fire" to refer to heroin and "girl" to refer to cocaine. The text messages discussed these terms followed by locations to meet. The final text communication made by Allen's cellular telephone was to the number of 414-388-1619: "Here 37th and Hampton north side black impala." Allen owned a black Impala at the time of his death.

22.     On November 16, 2021, at approximately 10:32 am WAPD Corporal Sharif Said used Allen's cellular telephone to send a text message to the number of 414-388-1619 to arrange a purchase of drugs for the amount of $100 at a location on the southside in two hours. Consistent with past communication between Allen and the number 414-388-1619, Cpl. Said text $100, which based on my training and experience would be consistent with Cpl. Said requesting 1 gram of heroin for $100. Cpl. Said received texts from the number of 414-388-1619 affirming that they could come to the location at that time. Cpl. Said began with the text "hey you good" which 414-388-1619 responded "Yea."

23.     The following is communications made by Cpl. Said using Allen's cellular telephone to the number 414-388-1619 on November 16, 2021, to arrange the drug transaction:

10:40 a.m. Cpl. Said: Can you meet me southside
10:47 a.m. Cpl. Said: I got 100, if you can meet me southside I can do something 2 hours
11:00 a.m. Cpl. Said: "?"
11:11 a.m. 414.388.1619: "Yea"

24.     Following these initial text messages on November 16, 2021, at 1:40 p.m. Cpl. Said sent a text message from Allen's cellular telephone to number of 414-388-1619 asking if

11

they could come to the address of 1003 South 38th Street in West Milwaukee, Wisconsin. Cpl. Said received a message back from the number of 414-388-1619 saying "Yes." The number of 414-388-1619 also called Allen's cellular telephone, which Cpl. Said answered and heard a male voice state that he was coming now. Cpl. Said hung up and texted the number of 414-388-1619 back at 1:52 pm: "My phone is jacked up" and "Yeah can you come."

25.     On November 16, 2021, at approximately 1:55 p.m. Cpl. Said, using Allen's cellular telephone, received a text message from the number of 414-388-1619: "Yes wat adress" and "?"

26.     On November 16, 2021, at approximately 1:56 p.m. Cpl. Said using Allen's cellular telephone sent the number of 414-388-1619 a text message: "1003 S 38th St." and "Sorry phone jacked." At approximately 1:56 pm Cpl. Said received the text message response from 414-388-1619: "15 mins."

27.     On November 16, 2021, at approximately 2:11 p.m. Cpl. Said sent the following message from Allen's cellular telephone to the number of 414-388-1619: "Hit me up when ur out front."

28.     On November 16, 2021, at approximately 2:20 p.m. Cpl. Said observed a silver 2014 Audi A7 Quattro, 3.0 Super Charge (Audi) with completely tinted windows, including the front windshield, arrive at the location of 1003 South 38th Street, West Milwaukee, Wisconsin. The Audi faced south and parked on the west side of South 38th Street directly in front of the address 1003.

29.     Cpl. Said then immediately received a text message on Allen's cellular telephone from the number 414-388-1619 saying: "Outside." At approximately the same time the number of 414-388-1619 called Allen's cellular telephone. Cpl. Said did not answer the call. Cpl. Said

sent a message at approximately 2:22 pm from Allen's cellular telephone to the number of 414-388-1619 stating: "you in the audi." Cpl. Said immediately received a message on Allen's cellular telephone from the number of 414-388-1619: "Yea wat u need."

30.    At this point it was believed that the Audi located in front of the residence of 1003 South 38th Street, West Milwaukee, Wisconsin was in fact there to deliver drugs in response to Cpl. Said's text messages and the arrests were made of the two individuals inside the Audi, Keandra K. MOORE (DOB XX/XX/1999) (MOORE) and Oliver D. MATHEWS (DOB XX/XX/2001) (MATHEWS).

31.    Law enforcement first observed MOORE was in the front driver's seat of the Audi.  As the arrest was taking place, MOORE did not follow commands and was reaching into the rear of Audi. WAPD Sargant Timothy Gold was positioned at the front of the Audi on the driver's side and yelled warnings to other officers that MOORE was reaching. WAPD Sargant Kevin Schmidt used a Conductive Electronic Weapon (CEW) also known as a taser to control MOORE from the rear passenger side window. In the rear driver's side of the vehicle, where MOORE was seen reaching, was a loaded assault rifle, Palmetto State Armory PA-15 5.56 Nato, bearing serial number SCD097681, with a double drum magazine that has a one hundred round capacity, containing seventy-one rounds in the magazine and one in the chamber.

32.    Also located on the rear passenger's floorboard, where MOORE was reaching, was 22.36 grams of an off-white, yellow hue, chunky substance, inside a ripped plastic sandwich baggie and .82 grams of an off-white chunky powder substance inside a rolled up and ripped plastic sandwich baggie, which both tested positive for fentanyl using the Nark II 20033 Fentanyl Reagent field test.

13

33.     On the driver's seat law enforcement also located a rolled-up plastic sandwich baggie with 4.57 grams of an off-white chunky substances and in a rolled up ripped plastic baggie .20 grams of an off-white powdery substances, which both tested positive for fentanyl using the Nark II 20033 Fentanyl Reagent field test. Between the driver's seat and center console, law enforcement also located a balled-up plastic baggie with 1.47 gram of a white powdery substances, which tested positive for fentanyl using the Nark II 20033 Fentanyl Reagent field test.

34.     Law enforcement located $5,906.00 in multiple denominations in MOORE's pant pocket and a medication bottle with a missing label that contained 11½ Oxycodone Hydrochloride 30mg pills, round blue w/ imprint "M/30,", which was identified by case agents using Drugs.com website. Once at the police station, case agents conducted an authorized strip search of MOORE, pursuant to department policy and Wisconsin State Statute Section 968.255 and located a plastic baggie containing fentanyl stuck to his buttocks. This plastic baggie contained approximately 1.37 grams of a substance that tested positive for fentanyl using the Nark II 20033 Fentanyl Reagent field test. MOORE additionally had a paper fold containing fentanyl inside the crotch area of his underwear. The paper fold contained approximately .10 grams of a substance that tested positive for fentanyl using the Nark II 20033 Fentanyl Reagent field test.

35.     In the front passenger seat of the Audi was seated MATHEWS.   Between MATHEWS' left leg and center console was a loaded assault rifle, Zastava Arms MDL 7.62 x 39mm, bearing serial number Z92-079507, with a drum magazine containing sixty-three rounds in the magazine and one in the chamber.   Inside MATHEWS' pant pocket was $2,677.00 in multiple denominations.

14

36.     Law enforcement also located a digital scale inside the Audi.  Law enforcement also located inside the front passenger's door map compartment, near the floor under the passenger side door handle, a bag containing the following items:

    a. 14.08 grams of an orange chunky substance, inside knotted plastic, which tested positive for fentanyl using the Nark II 20033 Fentanyl Reagent field test;

    b. 1.30 grams of a white powdery substance, inside rolled up plastic sandwich baggie, which tested positive for fentanyl using the Nark II 20033 Fentanyl Reagent field test;

    c. .48 grams of an off-white chunky substance, inside rolled up plastic sandwich baggie, which tested positive for fentanyl using the Nark II 20033 Fentanyl Reagent field test;

    d. 5.40 grams of an off-white chunky substance inside rolled up plastic baggie. which tested positive for cocaine using the Nark II 2007 Scott Reagent Modified;

    e. 17 Oxycodone Hydrochloride 30mg pills, round blue w/ imprint "M/30," inside knotted plastic sandwich baggie, which was identified by case agents using Drugs.com website; and

    f. 1 Oxycodone Hydrochloride 10mg pill, round pink w/ imprint "K/56," inside loose plastic sandwich baggie, which was identified by case agents using Drugs.com website.

37.     Law enforcement located a total of 46.75 grams of substances that tested positive for Fentanyl, 29 ½ Oxycodone pills, and 5.40 grams of substances that tested positive for cocaine.  Law enforcement also located four cellular telephones, inside the Audi.

38.     Law enforcement located a Sprint Kyocera black, and silver flip cellular telephone, model #E4277, on floorboard of driver's seat of the Audi.  Law enforcement used Cpl. Said's work number and called 414-388-1619, which was the number used to arrange the drug transaction and Device A rang and showed Cpl. Said's work number as the incoming call. This Sprint Kyocera black and silver flip cellular telephone, model #E4277 was placed on WAPD property number 21-006327-33. Law enforcement located a white Apple iPhone cellular telephone, with a black case, on front driver's seat plugged into a charger connected to the center

15

console of the Audi and placed it on WAPD property number 21-006327-40. Law enforcement located a black and silver Sprint Kyocera flip style cellular telephone, Model #E4277, on front passenger seat of the Audi and placed it on WAPD property number 21-006327-41. Law enforcement located a black Apple iPhone cellular telephone, with a cracked back, on front passenger seat of the Audi and placed it on WAPD property number 21-006327-4.

39.   On November 29, 2021, Honorable Judge Stephen C. Dries authorized a warrant for the search of the four telephones located inside the Audi during the arrest of MOORE and MATHEWS.  The phones were as following:

   a.  a Sprint Kyocera black and silver flip cellular telephone, model #E4277, having phone number (414) 388-1619 (FCC ID: V65E4255 // DEC: 268 435 459 910 870 297 // HEX: A00 000 27A 5DE 19), listed under WAPD property number 21-006327-33;
   b.  a White Apple iPhone cellular telephone, with a black case, listed under WAPD property number 21-006327-40;
   c.  a Black and silver Sprint Kyocera flip style cellular telephone, Model #E4277 (FCC ID: V65E4255 // DEC: 268 435 459 911 905 779 // HEX: A00 000 278 5AA F3), listed under WAPD property number 21-006327-41; and
   d.   a Black Apple iPhone cellular telephone, with a cracked back, listed under WAPD property number 21-006327-42.

40.   Affiant is aware that the information from these phones confirmed that the Sprint Kyocera phone, with phone number (414) 388-1619, was used in numerous previous communications with the deceased David Allen's phone for apparent drug transactions beginning April 29, 2020. All of the text messages between David Allen's phone and (414) 388-1619 were consistent with drug transactions, communicating weights consistent with drug sales and meet locations and times. There were no text messages concerning any other matters in these text threads between Davis Allen's phone and (414) 388-1619.

16

41.     Pursuant to a federal search warrant, the four phones described in paragraph 39 were searched and partial forensic extractions were able to be completed as to the I-Phones. The Back Apple I-Phone, with a cracked back, which was found on the front passenger side seat where MATHEWS was located, WAPD property number 21-006327-42, has an apple ID of omathews716@gmail.com. The white Apple iPhone cellphone, with a black case, located on front driver's seat plugged into a charger connected to the center console, between MOORE and MATHEWS, WAPD property number 21-006327-40, has apple ID of moorekeshawn052@gmail.com.

42.     I reviewed a Toxicology Report and Final Cause of Death report from the Milwaukee County Medical Examiner's office date February 9, 2022, which indicated Allen's immediate cause of death was acute mixed drug intoxication including fentanyl, meta/para fluor fentanyl, and ethanol.

43.     Based on the facts as set forth in this affidavit, there is probable cause to believe that the information described in Attachment A contains evidence that MOORE and MATHEWS have committed violations of 21 U.S.C § 841(a)(1), 841(b)(1)(C) (distribution of a controlled substance).     Specifically, the Location History data for omathews716@gmail.com and moorekeshawn052@gmail.com can be compared to Allen's location history to determine if MATHEWS or MOORE were in the vicinity of Allen during other narcotic purchases including the last transaction before Allen's death.

## CONCLUSION

44.     Based on the foregoing, I request that the Court issue the proposed search warrant. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant

17

by serving it on Google.  Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

18

**ATTACHMENT A**
**Property To Be Searched**
**Matter No. 2021R00412**

This warrant is directed to Google LLC and applies to:

(1) Location History data for omathews716@gmail.com and moorekeshawn052@gmail.com. The location data should be sourced from information including GPS data, cellular data, web App Activity, "My Activity", user photos, and information about visible wi-fi points and Bluetooth beacons transmitted from devices associated with omathews716@gmail.com and moorekeshawn052@gmail.com during April 29, 2020 12:00 am (CST) – November 17, 2021 8:00am (CST)

**ATTACHMENT B**
**Property to be Seized**
**Matter No. 2021R00412**

I.  Information to be disclosed by Google

The information described in Attachment A, via the following process:

1.  Google shall query Location History data for omathews716@gmail.com and moorekeshawn052@gmail.com as described in attachment A. The location data should be sourced from information including GPS data, cellular data, web App Activity, "My Activity", user photos, and information about visible wi-fi points and Bluetooth beacons transmitted from devices associated with omathews716@gmail.com and moorekeshawn052@gmail.com during April 29, 2020 12:00 am (CST) – November 17, 2021 8:00am (CST)

2.  The location data should include latitudinal and longitudinal coordinates, dates, and times for omathews716@gmail.com and moorekeshawn052@gmail.com for the abovementioned timeframe.